My name is Carol Edward, and may it please the court, I am here on an immigration case today. I am here today to talk about two forms of witness withholding in Convention Against Torture. They are related and under entangled reliefs. They're both based upon persecution suffered or to be suffered at the hands of Ugandan authorities. The other issue involved in this case has to do with credibility. And the credibility tied into the fact that obviously the applicant has the burden to establish that he's eligible for withholding of removal and Convention Against Torture. And the IJ just didn't believe him. No, the IJ didn't believe him. And I'm not trying to argue that my client has totally clean hands. The judge did have some questions to look at him. And it reminds me of the boy who cried wolf. As a child, you hear the story about the boy who told the story. And I'm sure the court's familiar with that. And there's something that really happens, and everyone goes, wow, did this really happen or not? And based upon his past transgressions, there certainly was a reason to question him further. Now, this is a Real ID Act case. It is a Real ID Act case. So I think that the IJ is permitted to look at lies that may or may not go to the heart of the particular issue before the IJ to determine whether the IJ thinks he's lying about this issue. Is that correct? Yes, I would agree, Your Honor. And I would also agree that the ID Act, the Real ID Act, says that in circumstances where you have questions about credibility, you should ask for cooperating evidence. And in this case, there was a lot of cooperating evidence. And that is the basis that we believe that established that what he was saying on the issues in crux here, especially about the torture, were in fact true. And that is why this Court should find. So review for me the corroborating evidence. I didn't see a lot of corroborating evidence of the likelihood of torture. Okay. The corroborating evidence on the likelihood of torture had to do with, first of all, what his own statement was that he was tortured by having a needle thrust in his scrotum. And what evidence do we have that that was true? The only actual evidence we have on that specific is a doctor who looked at him and said there was scar tissue. There was actually two doctors who looked at him, but one doctor did a thorough report, had him lay in the position that he claimed to have been in when the injection occurred, said this could have happened, and if this happened, the scar tissue is where that would have formed. Obviously, the doctor wasn't there. The doctor didn't see it. But he said it's consistent with what he says. And that is all we can ever get on credibility of torture, unless you actually have photos of the person being tortured. Well, it depends on the sort of torture. I mean, if his fingernail is being pulled out, the fingernails are pulled out. Some torture, all you have is the testimony. I understand that. Right. But even then, how did the fingernails get pulled out, and how did that happen? We never can know without video evidence. But what bothers me about this corroborating evidence is that if, in fact, he had been tortured in this fashion, it may very well be that this is all the corroborating evidence he would be able to present. On the other hand, given his history of lying and the ambiguity of this so-called corroborating evidence, I'm not sure the IJ was compelled to believe him. Well, there's other reasons to believe him as well, and those other reasons are reasons that have to do with the state reports and the NGO reports and the fact that he says this happened when he was in custody, and he was in custody. So we know he was in custody. The U.S. government got him from the Ugandan authorities in Uganda, so they know he was in custody. So we're not saying, well, we don't know. And in custody after a conviction under Ugandan law, right? Apparently, although the record is sort of fuzzy on that, apparently there was a conviction. But when you look at the dates he was removed and the dates the conviction allegedly occurred, it's confusing. But he conceded there was a conviction. So this is not one of these – they pick up a bad guy, they torture him without judicial process and so on. From what he tells us, he had been validly convicted under Ugandan law. He was in prison pursuant to the conviction. Right. But that still doesn't mean that it's okay to be tortured under those circumstances. The question is whether his statement he was should be believed. That's all. Well, the other thing to look at, Your Honors, it has to do with all these other reports. There's a BBC report in 2004 that said, torture is an indispensable part of operations of the security force. Torture is presented as part of the training or learned practice. That's at AR-896. You have an expert witness from a refugee project within Uganda who is a lawyer who did provide a statement. And I realize that initially he wasn't available telephonically, and there was an argument saying that his evidence shouldn't be considered. But then he was made available at a later date. We have Human Rights Watch talking about invisible torture. We have torture is a pervasive problem in Uganda from Torture in Uganda Redress Trust. Human Rights Watch saying injunction in testicles occurs. That was a 2004 report. I mean, there is as much evidence as you can get without being there. Right. No, I understand that. But his problem is that he lies about a lot of stuff. If he otherwise came in as a truth teller, I might be inclined to think that the IJ, with this amount of corroboration, and I think he's probably right that he couldn't get more corroboration on this sort of torture had it existed, had it happened. I might say the IJ was wrong. But the IJ has somebody before him who's engaged in a massive fraud in the United States, who's lied on a number of other occasions, and now says, please believe me on this. And this is clearly an intelligent man who could very well have read all the reports. He might well know that this is a very common form of torture, and he constructs a story to fit that. Some of the – I believe his asylum application had been submitted before, although I think his testimony was done at a later date. Some of his testimony was. But the evidence – because he was testifying in 2009 and 2010. But the asylum application had been submitted at an earlier date, which alleged that. And I am not sure whether or not all of these reports were out at that time. They continued to come out, and they continued to be submitted. For example, the 2008 report was submitted in 2000. The country reports don't come out until, I think, May of 2009. And at the time this was done, the next years wouldn't have even been out yet. So it wasn't produced as part of the evidence. So it's – yes, he's intelligent. But he goes online, doesn't he? He's got this story. I don't know whether he lies when it helps him or hurts him or what. He's buzzing back and forth between Canada and the United States many times, has many entries and exits and such. There's no record of that here. But he talks about it would seem to be helpful to him, I suppose, if he was going back and forth and back and forth, which then suggests maybe he wasn't that scared about being in Uganda. Well, he didn't go back after the torture occurred, and the torture occurred in 2002 when he was in custody. Well, because he was then brought to the United States and in custody here. That's true. So he didn't go back after he was in custody here, I suppose. So the fear that he has is twofold, Your Honor. One is that it didn't occur until 2002, so if he'd been going back and forth, and as he alleges, of course, and the judge did not find, nor did the BIA. And honestly, there isn't a lot of evidence to support what he says. He has some dental records, but the dentist is his sister. I mean, he has some records that he came in on a fraudulent visa under another name, and obviously there was a warrant outstanding. So I'm not going to try to argue that all of that shows good character or that he was there all the time. I also will point out, though, that the government's records aren't always accurate on who's going in and out. So whether those were complete or not, I do not know. But they certainly didn't demonstrate that he was here every three months, as he alleged. Nonetheless, I guess the question here is, if you have somebody who has lied before, do you have to simply say, well, they've lied before, we're finding them not credible on these other issues, therefore they're not credible on this issue, regardless of how much evidence you could present? Because, frankly, I don't think there's any more evidence that could be presented. In the 2002 incident, and then there was the false arrest warrant that was issued. I call it a false arrest warrant because we don't really know what it was. It looks like a hybrid between a civil and a criminal matter. The brother described how he got it, and there was an affidavit submitted about that. The expert went to the court to find out about it and found out it wasn't actually registered as a civil case or a criminal case, and he was unable to determine what's going on with that. But we do know that activities like that also are something that the CID does there, which is the Ugandan authorities that is known for torturing people. So it's not like there's no evidence here. There's a lot of evidence. The question is, if you know somebody lies about other issues, and they present overwhelming evidence that compels a determination of torture, are we just going to ignore the overwhelming evidence and say, oh, well, they've lied before, and we find them to be a liar, and we find them to be dishonest, and it doesn't matter. Yes, he's done some good things, he's done some bad things, but there is definitely a record of dishonesty. Can we just ignore the evidence? I'm sympathetic with the case you're trying to make in this sense, but you're sliding between two terms. One is overwhelming evidence, which you're saying we're faced with overwhelming evidence, and the other one is as much evidence under the circumstances alleged as could be produced. That's not necessarily overwhelming. So I'm sympathetic with what you're trying to do, but evidence that is as much as could be presented, given the nature of what he says happened, is not necessarily overwhelming evidence. I would argue, Your Honor, that it is compelling evidence and that it meets the standard required simply because – What's the standard required? Well, I think that – It meets the standard required. Okay. I think the Convention Against Torture, obviously you have jurisdiction over that to decide that fact. That is through the statute. But when we're talking about – when we're talking a lot of times about somebody's credibility, we have to make – you guys get to make the determination on whether or not there is compelling evidence to support what a person is saying. Obviously, we can disagree with what the IJ did or the BIA did, and that's not sufficient when it comes to credibility issues. I understand that. And when I'm talking about compelling, I shouldn't have used it in that context. What you're really saying is that no rational trial of fact could possibly hold against him, correct? That's what you're saying. Yes. I am saying that in this context because I do not believe that there is any – given the – if we didn't have the country reports that were so specific, if we didn't have all the reports about how torture is commonly practiced, if we didn't have all that evidence in his favor, I can see how we could end up with a different result here. Okay. But there is one other thing I wanted to touch upon, and then I'll reserve my two minutes if there's no questions. And it has to do with a particularly serious crime. The judge – the BIA and the judge, particularly the BIA, said that – or ignored the issue on withholding where you have to show that the crime is a danger to the community of the United States. And he – it was a single-person panel on the BIA – made a determination that given the nature of this crime, even though there was no evidence of – or likelihood that there wasn't a lack of remorse or a lack of rehabilitation, he did find that it was a particularly serious crime. And on that issue also I think the court should look, because he's going beyond what has been done in all the other cases, and that is he's not an aggravated felon sentenced to more than five years. He didn't cause injury to a person, physical injury to a person. And although it is certainly a property crime, there's a great loss of money here to the federal and state government. There is no evidence that he lacks rehabilitation or that there's a likelihood of reoccurrence. Okay. Thank you. And you've saved some time. Okay, thank you. Are you ready? Good morning, Your Honors and may it please the Court. I'm Fred Sheffield on behalf of the Attorney General. We're asking that you dismiss this petition for review to the extent that petitioner challenges the denial of withholding of removal. And we're asking that you deny the petition with respect to the Convention Against Torture because the petitioner has not shown that this record compels the conclusion that he was credible or that he produced other evidence that shows that he's going to be tortured in Uganda. Briefly, with respect to withholding of removal and the particularly serious crime issue that opposing counsel just mentioned, I don't think there's any question that this is a case that is governed by 8 U.S.C. 1252 A2C, and that's the provision of the INA which limits the court's jurisdiction where an alien is convicted for criminal reasons. And in this case we have an alien who was ordered removed for criminal reasons and he was found ineligible for withholding of removal based on his crime as well. And under those circumstances, and these are cases that we cited in the 28-J letter that we submitted to the court last week, in particular Pachenkov, Bennett, and Martino-Zia, these are cases that just came out within the last month and involved similar circumstances. Under circumstances like this, the petitioner can only challenge the denial of withholding of removal and the particularly serious crime determination to the extent that he raises a legal or constitutional claim. Now looking through petitioner's brief and listening to opposing counsel's argument this morning, I don't hear a legal or constitutional claim. What I hear is taking issue with the weighing of factors by the board, the fact that in this instance that it was not a crime involving physical violence and the other circumstances involving the crime. But the board actually made, if you look at the board's decision, I think this is on page 6, the board notes all the facts that the petitioner discusses. The board notes that this wasn't a crime involving physical injury. The board notes that apparently some of the money at least went to rural villages in Uganda. So there's no question that the board omitted certain factors here. What we're dealing with is a challenge to the board's weighing of factors and we would argue that there's no jurisdiction for that issue. Counsel? Yes. Did the board make a determination as to whether or not the petitioner is a danger to the community? Well, I think that's implicit in the particularly serious crime determination. The Frantescu is the case that makes danger to the community one of the touchstones of the particularly serious crime determination, and the board certainly does reference its precedent decision in Frantescu and that it lists several of the factors as to why it, under Frantescu, is finding that this crime represents a particularly serious crime. I thought our precedent required the board to make a particular, a specific finding as part of its analysis that the petitioner was a danger to the community before determining whether or not a particularly serious crime had been committed. Do you argue with that? I don't know that the board needs to do so explicitly. And in any event, I mean, I want to return to my initial point, which was that I don't see that as, I don't know that that's the argument that's been raised here by a petitioner. Again, the court can only hear this argument with respect to the particular serious crime issue to the extent that the petitioner raises a legal or constitutional claim. Reading the petitioner's brief, the petitioner seems to be asking for a re-weighing of the factors. The petitioner doesn't specifically take issue with the fact that the board didn't explicitly acknowledge the danger to the community language. Well, the blue brief at 13 says that there is no reason to believe that he would pose a danger to the community should he be allowed to remain in this country. Right. You don't think that fairly raises the issue? No. I think that what that is doing is it's summarizing all the factors that the board considered, i.e., the lack of violence in this crime. And it's basically arguing that based on all of these factors, that the Frantescu standard wasn't met. But I don't hear in that one sentence, which is the only sentence in the brief, where the danger to the community language is brought up, I don't read petitioner as making a legal argument that the board omitted any reference to the danger to community standard. In any event, as I said before, I think by citing Frantescu, the board did its job in that respect. If there are no further questions on that issue, I would move on to the credibility issue, which really is the heart of this claim, because if the court finds that the adverse credibility determination is, in fact, supported by substantial evidence, that would really take care of both the Convention Against Torture claim and any withholding of removal claim. Petitioner's counsel has framed this as a boy who told a boy who cried wolf story and has suggested that petitioner's misrepresentations and fraudulent pasts have really nothing to do with his claimed fear of being tortured in Uganda. I would take issue with that, and I think the immigration judge took issue with that as well. Certainly there is a long history of fraud on the part of this petitioner, but there's also at least evidence of misrepresentations and inconsistencies in his testimony as well. And I think the most important inconsistencies relate to petitioner's description of when he believes he developed a fear of returning to Uganda. I'm not sure if Your Honors have the record in front of them, but on page 219 and 220, petitioner was asked directly, when is it that you started to fear returning to Uganda? And he said, it was after I was charged with treason. And he was asked to clarify, well, when was it that you believed that you were charged with treason? He says 2008. So at page 219 and 220, he's on the record as saying that it wasn't after he was allegedly tortured in 2002. In fact, he's asked this on page 219, and he says, I could have probably gone back in 2002 and 2003. So I think this is important. By petitioner's own account, it's not his experience while in detention in 2002 that is leading him to believe that he fears torture. It's something else, something that happened in 2008. What evidence, if any, do we have in the record besides his own testimony that he was ever charged with treason? Nothing. What we have is this warrant, and this warrant, as opposing counsel noted and also petitioner's own expert noted, is kind of a strange hybrid between a criminal arrest warrant and a civil arrest warrant. I think the expert even, and this is on page 603 and 604 of the record, petitioner's own expert says that this warrant is, he qualifies it as a fabricated but enforceable warrant. So according to petitioner's own evidence, this warrant is not legitimate. The expert nevertheless says, well, in his experience, the expert, this warrant could lead to Mr. Kalebu's arrest and torture, but the expert really doesn't provide any basis for why he believes this is the case, and this is why the immigration judge and DHS counsel thought it was really important to cross-examine this expert, but the expert wasn't available. I want to go back to, as I said before, the first instance that when petitioner's first testifying, he says 2008. That's when I developed a fear of returning. Later, and this is on page 242 and 243 of the record, he's asked again about when is it that you developed a fear of returning, and now he says 2003 and 2004 is when he decided really for the first time that he could go back. So that right there is inconsistent. Then within a few lines later, it's called to his attention, well, in 2007, now three, four years after you're saying that you could no longer go back, you also applied for a travel document to return to Uganda. So this is problematic. Petitioner is now applying for a travel document to return to the country where he claims he fears torture, and when he's called on this apparent problem in his testimony, his response is, well, I lied, Your Honor. I actually wasn't planning on going back to Uganda. I was planning on going back to Kenya. I mean, under these circumstances, I don't think you can blame the immigration judge for being a bit bewildered and coming to the conclusion that there have been so many lies, so much fraud in this petitioner's past that I really don't know what to believe. I mean, to me, it calls to mind a passage from this Court's decision in Cower, which was a pre-real ID decision. The Court said, it strains credulity to hold that the evidence presented at an asylum hearing compels us to find Cower believable  That, to me, is a similar case to what we have here. We have numerous inconsistencies both within the internal testimony with the documentary evidence, and apparently once petitioner is caught in the inconsistencies, then he comes forward and offers an explanation. Sometimes that explanation is as simple as, well, I was lying. The other inconsistencies that I think are significant are those between petitioner's testimony and the information that he included on a cancellation of removal application. He was asked on that application, have you ever given false testimony to obtain an immigration benefit? That document is page 524 of the record. He checked the box, no. Then when he's asked about this, he says, not to my knowledge. It's not until DHS counsel brings it to his attention that he in fact went to the consulate in Kenya with a false Ugandan passport and sought a visa to come to the United States. Similarly, he's asked on that same application, again, that's page 524, have you ever been excluded, deported, or removed from the United States? And he checks the box for no. And it's not until he's brought to his attention during his testimony that he was in fact ordered removed, or I'm sorry, he was actually ordered excluded and deported in 1974. He's asked, well, explain the inconsistency between your testimony and this document. And if this is an individual that is being truthful, you would think that he would just say it's a mistake. He doesn't say that. He instead claims that, well, I thought I was never admitted to the United States. This is page 211 and 213. So he's not even owning up to the fact that this is a false statement. And, of course, the fact that he was never admitted to the United States is really inconsequential because the question asks were you ever excluded, deported, or removed. So whether he was admitted or not is really of no consequence. Just with the remaining time, I would make a few notes about the documentary evidence. We, opposing counsel noted the doctor's report. I would even suggest that the documentary evidence in this case isn't particularly strong. We have two doctor's reports, one on page 904, one on page 1182. One doctor references two scars, and the second doctor's report mentions one scar. And the first doctor's report on 904 was written on a prescription pad and didn't seem to result from a thorough investigation. So I think that was something that the immigration judge and the board also found a little bit problematic. The last thing I would just point out is that Mr. Kalebu's claim is now that he fears torture as a result of being a pro-Buganda activist. And really I could find very little in the record to suggest that people who are known as pro-Buganda activists are particularly sought after by the government for torture or anything that Mr. Kalebu claims he fears. Subject to the Court's further questions, Your Honor, we would rest on our brief. Thank you. And Ms. Edwards, you've saved a minute. I just want to say, respond to three different issues. One is I believe this Court has jurisdiction, and that's very clear under Arbid v. Holder. Sorry, I'm sorry if you can't hear me. I can hear you. Okay, great. And then the other issue has to do with cooperation again. And the wife, there was a statement from the wife as well that said that the CID or some people they believed to be the CID were looking for him after the fact while she was still in Uganda before she came to the United States. And her statement was provided, and she was offered for cross-examination, and the government chose not to do so. There was a brother-in-law who got the search warrant who they were able to get a sworn statement from, and his testimony was offered. So when we're talking about corroborating evidence again, I think that as far as this specific incident that happened to him, there is as much as we could possibly provide here. I also want to point out there's even a picture of him bent over, which probably the Court doesn't want to look at, but that describes it so specifically because he was trying to give every possible piece of evidence that could establish that he did suffer this. And in terms of the I-131, it is not uncommon for people who have been separated from their family for years and years, even with different asylum kind of cases, to want to go back and see their family and to make arrangements to go to other countries. So for me as an immigration practitioner, I don't find that particularly shocking, but I realize that when the Court looks at that, they go, oh, he was going to Uganda, and realistically I don't think that's any evidence that he was going to go, although certainly that's something he did submit. So there is the evidence, again, I think clearly establishes that he would face torture. The Ugandan government knows about him. The other thing I want to point out is they know who he is. When he shows up at the airport, he's not like a surprise that he was essentially extradited from the country. The top diplomats in the country know who he is. So this isn't somebody who can just sort of slip in and no one will notice. And I thank you again. Thank you. Kalibu v. Holder now submitted for decision. Thank both sides for your arguments. And that completes our hearing for this morning, and we will be back tomorrow morning at 9 o'clock.
judges: Fernandez, Fletcher, Rawlinson